1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   VINCENT BENJAMIN TORRES,              No. 2:16-cv-0812 JAM KJN

12                    Petitioner,

13          v.                             FINDINGS & RECOMMENDATIONS

14   DUCART,

15                    Respondent.

16

17   I.  Introduction

18          Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his June 2011 convictions for

20   carjacking, kidnapping, street terrorism, two counts of second degree robbery, and attempted

21   second degree robbery.  Petitioner was sentenced to fifteen years-to-life, plus forty years and

22   eight months in state prison.  Petitioner claims that (1) the trial court abused its discretion in

23   denying a mistrial, (2) trial counsel was ineffective for failing to present expert eyewitness

24   identification testimony, (3) trial counsel was ineffective for failing to conduct a pretrial

25   investigation, and (4) the prosecutor committed constitutional error by referencing petitioner's

26   facial tattoos in closing argument.  After careful review of the record, this court concludes that the

27   petition should be denied.

28   //

                                    1

1    II.  <u>Procedural History</u>

2           On April 29, 2011, a jury found petitioner guilty of the following crimes: carjacking (Cal.

3    Pen. Code, § 215(a)) with personal use of a firearm (Cal. Pen. Code, § 12022.53(b)&(e)) and

4    commission for the benefit of a criminal street gang (Cal. Pen. Code, § 186.22(b)(1)) as special

5    findings; kidnaping to commit robbery (Cal. Pen. Code, § 209(b)) with the same special findings;

6    active participation in a criminal street gang/street terrorism (Cal. Pen. Code, § 186.22(a)); two

7    counts of robbery (Cal. Pen. Code, § 211) each with personal use of a firearm (Cal. Pen. Code,

8    § 12022.53(b)&(e)) and commission for the benefit of a criminal street gang (Cal. Pen. Code,

9    § 186.22(b)(1)) as special findings; attempted robbery (Cal. Pen. Code, §§664/211) also with

10   personal use of a firearm (Cal. Pen. Code, § 12022.53(b)&(e)) and commission for the benefit of

11   a criminal street gang (Cal. Pen. Code, § 186.22(b)(1)) as special findings; possession of a firearm

12   by a felon (Cal. Pen. Code, § 12021(a)); vandalism (Cal. Pen. Code, § 594(a)); escape from arrest

13   (Cal. Pen. Code, § 836.6(b)); and resisting a police officer (Cal. Pen. Code, § 148).  (LD 4 at 155-

14   175; LD 11 at 1178-83.)[1]  On June 13, 2011, petitioner was sentenced to an indeterminate term of

15   fifteen years-to-life plus a determinate term of forty years and eight months in state prison.  (LD 5

16   at 344-47; LD 16 at 1276-89.)

17          Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

18   District.  (LD 19 & 22.)  The Court of Appeal modified petitioner's sentence by striking and

19   staying the term imposed on two of the numerous counts, and otherwise affirmed the conviction

20   on December 3, 2014.  (LD 23 & ECF No. 24 at 27-37 [Ex. A].)

21          Petitioner filed a petition for review in the California Supreme Court (LD 25), which was

22   denied on January 12, 2015. (LD 26.)

23          Thereafter, petitioner filed a petition for writ of habeas corpus in San Joaquin County

24   Superior Court on April 18, 2016.  (LD 27.)  That same day, petitioner filed the instant petition

25   with this court.  (ECF No. 1.)  On July 19, 2016, the San Joaquin County Superior Court denied

---

[1] "LD" refers to the documents comprising the state court record, lodged with the court by respondent on June 28, 2017.  "ECF" refers to the court's electronic case management system; docket and page numbers referred to throughout are those assigned by the system at the time the document is filed.

1    the habeas petition.  (LD 28.)

2           On July 25, 2016, petitioner filed a motion for stay in the instant action.  (ECF No. 8.)

3    This court denied petitioner's motion without prejudice on September 9, 2016.  (ECF No. 9.)

4           In the interim, on August 25, 2016, petitioner filed a state habeas petition with the

5    California Court of Appeal for the Third Appellate District.  (LD 29.)  That court denied the

6    petition on September 30, 2016.  (LD 30.)

7           On October 19, 2016, the undersigned ordered petitioner to file an amended petition

8    asserting only exhausted claims.  (ECF No. 10.)

9           On November 21, 2016, petitioner simultaneously filed another motion to stay in this

10   court (ECF No. 11), as well as a petition for writ of habeas corpus in the California Supreme

11   Court (LD 31).  The state's highest court denied the petition on January 11, 2017.  (LD 32.)

12          Thereafter, on March 3, 2017, the undersigned denied petitioner's motion to stay as moot

13   in light of the California Supreme Court's denial.  Respondent was then ordered to file an answer

14   to petitioner's original petition.  (ECF No. 12.)   Respondent filed an answer on June 28, 2017.

15   (ECF No. 24.)

16   III.  Facts[2]

17          In its unpublished memorandum and opinion modifying petitioner's sentence and

18   affirming the judgment of conviction on appeal, the California Court of Appeal for the Third

19   Appellate District provided the following factual summary:

20              On the night of December 11, 2008, Marco Serrano and his
                girlfriend, Yesenia Andrade, were seated in Serrano's car in a
21              Stockton parking lot. Serrano was in the driver's seat and Andrade
                was in the front passenger seat. Their friend, Sergio Morales, was in
22              the backseat. They were waiting to meet up with Serrano's friend
                Jesse P.
23
                A Hispanic man knocked on the driver's window to ask for a light.
24              The man was wearing a dark hooded sweatshirt with the hood up,
                and a "rag" (a handkerchief or bandana) partly covering his tattooed
25              face. When Serrano lowered the window, the masked man
                brandished a gun and forced his way into the seat behind the driver.
26

27   _____
     [2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
28   District in People v. Torres, et al., No. C068523, filed December 3, 2014, a copy of which was
     lodged by respondent as LD 23.

                                                    3

A second man, who had been standing behind the gunman, entered the front passenger seat, forcing Andrade into the back.

Moments later, when Serrano's friend Jesse walked up to the car, the gunman confronted him. Jesse testified that the gunman, who had a "red rag" over his nose and mouth, took $20 from the pocket of Jesse's sweatshirt before sending him away. Jesse returned to his brother's car and they called police.

Meanwhile, the gunman told Serrano to drive and demanded that Morales and Andrade turn over their money; they had none.

Police officers, responding to a dispatch, stopped the car a few minutes later. The officers saw two men run from the vehicle; one escaped, but officers chased and apprehended the other, eventually identifying him as Raymond. Raymond was wearing a bandana around his neck and had Serrano's cell phone in his pocket.

Several days later, a detective met with Andrade and Serrano. Andrade reported that the suspect who escaped had facial tattoos. The detective showed her a photographic lineup of approximately 60 local men with facial tattoos. Andrade identified Vincent as the gunman; his cheeks were emblazoned with large numerals "1" and "4." Variants of the number 14 represent the letter "N" for "Norteño." An expert testified that, in the local community, a majority of people would have recognized the symbol on Vincent's face and understood its "intimidation factor." Morales told a detective the suspect had "14" on his face and identified Vincent from a photographic display.

Vincent was arrested at the courthouse a month later, while attending a hearing for Raymond. He tried to escape, breaking a window with a chair, but he was restrained during a struggle with police officers. At trial, he admitted being a gang member, admitted that gang members get respect by committing crimes, and also admitted that he was a "runner," someone who jumped off roofs, out of windows and away from cars to avoid police. In addition, he admitted "d[oing] time" for fighting, stealing cars and other crimes, but he denied any role in the crimes for which he was charged, saying carjacking was "out of [his] league."

Raymond and Vincent were tried together for the charged offenses. At trial, Morales positively identified both defendants. Raymond said he was involved in the crimes only because another armed gang member forced him to participate. Andrade, crying, said she was frightened and did not want to testify. She denied her earlier identifications but admitted that she told police the truth when the facts were fresh in her mind. Jesse also denied an identification he made on the night of the crime, insisting he saw only a red rag covering most of a face while a gun touched his head.

(People v. Torres, et al., slip op. at 3-4.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision.  Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

5

correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

////

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, (2013) (citing Richter, 562 U.S. at 98. If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

V.  Petitioner's Claims

A.  *Petitioner's Sixth and Fourteenth Amendment Rights to Due Process & Fair Trial*

Petitioner claims that the trial court's refusal to grant his motion for mistrial when the jury deadlocked during deliberation violated petitioner's constitutional rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution. (ECF No. 1 at 4, 21-33.) Respondent contends the state court's rejection of petitioner's claim was reasonable and precludes federal habeas relief. (ECF No. 24 at 11-15.)

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Vincent further contends the trial court erred in the handling of a
> deadlocked jury. He claims the trial court deprived him of a fair trial

8

and due process by directing the jury to continue deliberations under circumstances he describes as "coercive."

Deliberations commenced on April 22, 2011. At noon on April 27, jurors sent a note to the trial court saying, "We have 6 jurors who cannot place Vincent at the crime [scene] beyond a shadow of a doubt. We have worked on this for about 6 hours and cannot move forward. [¶] We have agreed on all counts regarding Raymond."

An hour and a half later, apparently following a lunch break, they sent another note saying, "In regards to Vincent—if we cannot determine beyond a shadow of a doubt his presence in counts 1, 2, 4, 5 & 6—can we then rule on his participation in a street gang as set forth in count 3?" The trial court promptly responded by telling jurors they appeared not to be applying the correct burden of proof and that "[p]roof beyond a shadow of a doubt is not the correct burden of proof." The trial court directed jurors to the correct page in their jury instruction packets and read to them the instructions on the burden of proof.

The following afternoon, on April 28, the jury wrote to the judge saying, "We are unable to reach a unanimous decision on several counts...." The trial court called the jurors into the courtroom and told them it would confer with counsel and then ask them questions the next morning, when defendants and counsel could be present.

On the morning of April 29, the trial court inquired of the jurors in writing, "Are you yet unable to reach a unanimous decision on several counts? Have you reached verdicts on other counts?" The foreperson wrote back on the same page, "We cannot agree that 1 suspect was there. One juror is holding out."

After bringing the jurors back into the courtroom, the trial court asked whether further deliberation, instruction from the trial court or the reading of testimony could assist the jurors on the remaining counts. The foreperson said no, but when the jurors were polled, the sixth juror responded, "Instruction from the Court." At that point, the trial court sent the jurors back to the deliberation room, directing them to "set out in writing what area you believe further instruction could be of assistance." The jurors did not identify an area for further instruction but instead reached a verdict. It found Vincent guilty on all counts.

When there is a jury impasse, a trial court "must at least consider how it can best aid the jury." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97, italics omitted.) The trial court "should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict," and it may thereafter give additional instructions, clarify

previous instructions and/or permit additional closing argument. (Cal. Rules of Court, rule 2.1036.)

A jury may be discharged if "it satisfactorily appears that there is no reasonable probability that the jury can agree." (Pen.Code, § 1140.) Determining whether there is a reasonable probability of agreement rests within the sound discretion of the trial court. (*People v. Harris* (2005) 37 Cal.4th 310, 363.) The trial court may direct further deliberations to enhance the jury's understanding of the case but not as a means of pressuring it to reach a verdict on issues it already has discussed and considered. (*Id.* at p. 364.)

A defendant's right to a fair trial may be violated if a trial judge's inquiry into jury balloting is "likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision." (*Locks v. Sumner* (1983) 703 F.2d 403, 406.) The issue of coercion must be viewed in context. (*Ibid.*) In other words, a trial court must not displace a jury's independent judgment in favor of "'compromise and expediency.'" (*People v. Sheldon* (1989) 48 Cal.3d 935, 959.) When a trial court knows there is "a single holdout juror favoring acquittal," remarks about the clarity of the evidence, the simplicity of the case, the necessity of reaching a unanimous verdict or the threat of being sequestered overnight could be considered coercive. (*Id.* at pp. 959–960.)

Vincent claims the trial court should have done something different because the jury revealed there was one juror holding out. We conclude, however, that there was no abuse of discretion and, thus, no error. The trial court's query to the jury was appropriate under California [R]ules of Court, rule 2.1036, and following up on a juror request for further instruction by asking that the instructional issue be reduced to writing was not inherently likely to put undue pressure on the holdout juror. The trial court did not ask the jury to deliberate further at that point.

Vincent cites *People v. Valdez* (2012) 55 Cal.4th 82, 164, arguing that the trial court should have directed the jurors not to compromise for the purpose of reaching a verdict. But the trial court previously instructed the jurors with the following directions, among others: "Each of you must decide the case for yourself.... [¶] Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you." (CALCRIM No. 3550.) Although Valdez referenced additional language from another pattern jury instruction in the context of a harmless error analysis, it did not prescribe what a trial court should say to a deadlocked jury. (*Valdez, supra*, 55 Cal.4th at p. 164.)

Here, the trial court sent the jury out to identify an instructional issue

that at least one juror believed might break the impasse; the trial court did not comment on the deadlock. We need not speculate on whether a holdout juror "caved," as Vincent puts it, to avoid the "lengthy, potentially painful process of further instruction," or "fruitless deliberation." There is no evidence that the trial court coerced a holdout juror or that Vincent's right to a fair trial was abridged by the way the deadlock was handled.

(People v. Torres, slip op. at 8-10.)

*Applicable Legal Standards*

"Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." Lowenfield v. Phelps, 484 U.S. 231, 241 (1988); see also Smith v. Curry, 580 F.3d 1071, 1073 (9th Cir. 2009) ("a trial judge [may] instruct a deadlocked jury about its duty to deliberate, but [is barred] from trying to force or coerce a verdict"). Whether a jury was "improperly coerced requires that we consider the supplemental charge given by the trial court in its context and under all the circumstances." Lowenfield, 484 U.S. at 237 (citation & quotation marks omitted).

Specifically, in Lowenfield, the Supreme Court stated that a habeas court must consider the trial judge's statement "'in its context and under all the circumstances.'" Id. at 237 (citation omitted). As the Court acknowledged, the fact that "the jury returned with its verdict soon after receiving the supplemental instruction ... suggests the possibility of coercion." Id. at 240. Nevertheless, the Court concluded that the judge's supplemental charge to the jury was not coercive. Id. at 241. The jury had sent out a note stating that it was unable to reach a decision at that time. In written responses to the judge's question, eight jurors believed further deliberations would be helpful and four jurors did not. When the jurors returned to the courtroom, a new note was given to the judge indicating that some jurors misunderstood the question. The judge asked "Do you feel that any further deliberations will enable you to arrive at a verdict?" Eleven jurors responded in the affirmative and one juror in the negative. The judge gave a supplemental charge and sent the jury back for deliberations. Id. at 234-35.

More recently, in Early v. Packer, 537 U.S. 3 (2002), a juror sent a note to the judge asking to be dismissed after twenty-eight hours of deliberation. In response to the judge's

questions, the juror explained that "'because of the seriousness of the charges, I can't make snap decision.... I was beginning to feel a little burned out.'" Id. at 4 (citation omitted). The judge asked her if she could hold on a little bit longer, and the juror agreed. The judge said, "'I really appreciate it. Otherwise, they have to start deliberations all over again with another person.'" Id. (citation omitted). The next day, the foreman sent the judge a note that the jury could no longer deliberate, that nearly all fellow jurors question the one juror's ability to understand the rules and to reason, and that continuing would result in a hung jury. The judge responded: "'The juror has a right to do that, as you all know. They have a right to disagree with everybody else. But they do not have a right to not deliberate. They must deliberate and the rules and laws as I state it to them.'" Id. at 5 (citation omitted). The foreman indicated that further deliberations would be helpful, and the judge gave a supplemental charge. When deliberations resumed on Friday, the same juror asked to be dismissed. She complained about disrespect from other jurors and feeling angry to the point that she did not believe she could be objective. In response to the judge's question, the juror indicated that she was continuing to deliberate but not to the satisfaction of the other jurors. The judge returned her to the jury room and the jury continued to deliberate. When the jury met on Tuesday, the jury returned a verdict of guilty on the attempted murder count. Id. at 6. The Supreme Court concluded that the petitioner was not entitled to habeas relief. "Even if we agreed ... that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." Id. at 11.

### *Analysis*

The undersigned has reviewed all jury questions or communications, as well as the court's interactions with respect to those questions or communications. (LD 4 at 194-201 [see also LD 4 at 141, 143-46, 148, 150-52]; LD 10 at 1157-68; LD 11 at 1174-78.)

Initially, the undersigned notes the jury spent hours deliberating petitioner's innocence or guilt all the while applying an incorrect standard to the evidence before it. (See LD 4 at 146, 197-98.) As the record establishes, and as the state appellate court's opinion points out, the jury's communications with the trial court reveal an inability to reach a verdict while applying a burden of proof that does not exist, to wit: "beyond a shadow of a doubt." The trial court pointed out the

12

jury's error, directed them to the correct standard as reflected in the applicable jury instruction, and asked them to return to their deliberations. Nothing about this interaction is incorrect or coercive. And, any reference to the hours the jurors spent deliberating under this incorrect definition of the burden of proof does not fall in favor of an argument that the trial court's actions were coercive in any way. Lowenfield, 484 U.S. at 237-241.

The circumstances here do not warrant a result different from that in Early, in which the Supreme Court upheld the state appellate court's determination that there was no unconstitutional coercion, finding that the decision was neither contrary to nor an unreasonable application of clearly established federal law. Similarly, the trial court in the instant case did not go nearly as far to encourage the jury to reach a verdict as the trial court in Early. Unlike in Early, in which the trial judge inquired as to the vote count, here the jury volunteered that information in its note, in violation of the court's instruction. Moreover, the trial court in the instant case was not aware of the identity of the holdout juror and did not single-out the holdout juror with an individual audience encouraging further deliberation.

In Parker v. Small, 665 F.3d 1143 (9th Cir. 2011), the trial court knew both the division of the jurors and the reason for a single holdout juror's unwillingness to convict. Id. at 1145. In its supplemental charge, the trial court advised the jury of its duty "to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment." Id. at 1146. The trial court also suggested the jury try new methods of deliberation and gave examples as to what they could do differently, such as having different jurors leading the discussions or having those on one side of an issue present and argue the other side's position. Id. The Ninth Circuit held that the state court's determination that there was no jury coercion was not contrary to, or an unreasonable application of, clearly established federal law. Id. at 1148.

Here, like Parker, the trial court similarly advised the jury of its duty to deliberate and offered possible court actions that might assist the jury, such as readback of testimony, clarification of previous instructions, or additional instructions. The circumstances of the instant case are not sufficiently distinguishable from those in Parker warranting a different result.

////

13

The Third Appellate District's ruling that the trial court's actions were not coercive is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. As fairminded jurists could disagree whether the state court's decision conflicts with the Supreme Court's precedent, the court must defer to the state court's decision. Id. at 101. Simply put, the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254(d)(1). As a result, the undersigned recommends the claim asserted by petitioner in ground one of his petition be denied.

B. *Trial Counsel Provided Ineffective Assistance of Counsel – Eyewitness Expert*

Petitioner claims that by failing to retain and offer the testimony of an eyewitness identification expert, trial counsel provided ineffective assistance of counsel in violation of petitioner's constitutional rights under the Sixth Amendment to the United States Constitution. (ECF No. 1 at 4, 34-43.) Respondent maintains the state court's determination was not objectively unreasonable, barring relief in these proceedings. (ECF No 24 at 15-18.)

The last reasoned rejection of petitioner's second claim is the decision of Third District Court of Appeal. The state court addressed this claim as follows:

> Vincent contends he was denied effective assistance of counsel because his lawyer failed to offer an expert on the fallibility of eyewitness identification.
>
> A criminal defendant has the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and also under article I, section 15 of the California Constitution; a defendant is entitled to the "'reasonably competent assistance of an attorney acting as his diligent and conscientious advocate.'" (*In re Gay* (1998) 19 Cal.4th 771, 789–790.) A diligent and conscientious advocate is one who makes rational and informed decisions on strategy and tactics, based on adequate investigation and preparation. (*Id.* at p. 790.) To establish a claim that this right was denied, a defendant must show that his attorney made errors so serious that he did not serve the function of counsel and also that the deficiency prejudiced the defense so much that the defendant was deprived of a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) Unless the defendant proves this, a reviewing court presumes that counsel performed within a range of professional competence. (*Ibid.*) "The Sixth Amendment guarantees reasonable

14

competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8 [157 L.Ed.2d 1, 9].)

Vincent told the trial court in a *Marsden* [*People v. Marsden* (1970) 2 Cal.3d 118] hearing that he wanted an identification expert and that his lawyer had disagreed. Vincent's lawyer explained that he had been defending criminal defendants for 12 years and had used identification experts but, in this case, he believed an expert was not in Vincent's best interest. He went on to explain to the trial court that he was ready for trial and he knew none of the witnesses had mentioned the tattoo on the night of the crime, so he did not need an identification expert to point out the flaws in their subsequent identifications or the suggestive nature of the photographic displays. He had determined that the critical issues were "not [in] the realm of an ID expert." This colloquy demonstrates that the decision not to engage an expert was a rational and informed one, made after investigation and preparation.

At trial, Vincent's lawyer impeached the testimony of the eyewitnesses on cross-examination and again in closing argument, emphasizing the significance of CALCRIM No. 315 and the instruction on eyewitness identification, and pointing out inconsistencies and evidence that each of the witnesses was impaired, mistaken and/or biased. Vincent's attorney also pointed out demonstrably false testimony by the eyewitnesses and emphasized the instruction that when a witness has been "willfully false in one part of their testimony, you can disregard [or discount] the whole of their testimony." He argued that on the night of the crime all the witnesses who saw the gunman described his clothing consistently, but none identified Vincent or mentioned his distinctive facial tattoos to police. This record demonstrates reasonably competent assistance by a diligent and conscientious advocate.

Vincent does not identify anything an expert might have said to further challenge the eyewitness testimony. We may not second-guess a tactical decision about whether to put on a particular witness unless it is apparent that the decision stemmed from an unreasonable failure to investigate. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) Vincent's counsel was aware of the significance of witness identification issues when he made a tactical decision to attack witness credibility directly by impeachment and argument rather than through the testimony of an expert. A claim for ineffective assistance of counsel fails when it is based on a rational choice among legitimate trial tactics. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

Cases cited by Vincent about errors in the exclusion of expert

testimony are inapposite because the trial court did not exclude testimony. Vincent's lawyer chose not to offer the testimony and, as we have said, that choice did not demonstrate ineffective assistance of counsel.

(People v. Torres, et al., slip op. at 5-7.)

### Applicable Legal Standards

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

Under the first prong of the Strickland test, a petitioner must show that counsel's conduct failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689). Petitioner must rebut this presumption by demonstrating that his counsel's performance was unreasonable under prevailing professional norms and was not the product of "sound trial strategy." Strickland, 466 U.S. at 688-89. Judicial scrutiny of defense counsel's performance is "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at the time it occurred, without the benefit of hindsight. Id. at 689. "[S]strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

The second prong of the Strickland test requires a petitioner to show that counsel's conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. at 693. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693). "The likelihood of a different

1  result must be substantial, not just conceivable." Id.

2                    *Analysis*

3        The state court's denial of petitioner's claim did not involve an unreasonable application

4  of Supreme Court precedent.

5        While the record lodged with this court does not include the sealed reporter's transcripts

6  from the Marsden[4] proceedings referenced in the Third District Appellate Court's opinion, the

7  undersigned accepts that court's recitation of the events in the absence of clear and convincing

8  evidence to the contrary.  28 U.S.C. § 2254(e)(1).

9        As noted in the state court's opinion (LD 23 at 6-7), petitioner's experienced trial counsel

10  indicated that while he had previously employed the use of an identification expert while

11  defending other clients, counsel did not believe such an expert was in petitioner's best interests.

12  This determination was so because none of the victim witnesses mentioned petitioner's tattoo on

13  the night of the incident, allowing trial counsel to challenge their identifications as flawed or to

14  argue the photographs selected by law enforcement were suggestive in nature.  Trial counsel thus

15  determined such an expert was not a critical issue in petitioner's case.  The state court's holding

16  that trial counsel's "decision not to engage an expert was a rational and informed one, made after

17  investigation and preparation," is reasonable and in accord with Supreme Court precedent.  See

18  Strickland, 466 U.S. at 688-90.

19        The Third Appellate District's findings (LD 23 at 7) that trial counsel effectively cross-

20  examined the victim witnesses on the issue of identification, and argued the issue to the jury, is

21  supported by this record.  (See LD 8 309-15, 319-20, 325-29, 373, 460-62, 464-73; LD 9 631-35,

22  1110-23.)  See also 28 U.S.C. § 2254(d)(2);  United States v. Labansat, 94 F.3d 527, 530 (9th Cir.

23  1996) (counsel's failure to call eyewitness identification expert not ineffective or prejudicial,

24  where counsel could have explored asserted unreliability of delayed identifications through cross-

---

26  [4] The term "Marsden motion" comes from People v. Marsden, 2 Cal. 3d 118 (1970), holding that,
    as part of a criminal defendant's right to effective assistance of counsel under the Sixth
27  Amendment, a trial judge must permit a defendant requesting substitute counsel the opportunity
    to present specific examples of inadequate representation before the court may deny a motion to
28  substitute counsel.  Marsden, 2 Cal. 3d at 123-24.

17

examination and closing argument, and other evidence linked defendant to crime); <u>Howard v. Clark</u>, 608 F.3d 563, 574 (9th Cir. 2010) (no prejudice where "skillful cross examination of witnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable"); <u>Brown v. Terhune</u>, 158 F. Supp. 2d 1050, 1071 (N.D. Cal. 2001), <u>aff'd</u>, 59 Fed.Appx. 190 (9th Cir. 2003) (counsel not ineffective for failing to call eyewitness identification expert, where counsel cross-examined eyewitnesses concerning identifications and emphasized alleged problems with identifications in closing).

Further, as the state court findings note, petitioner did "not identify anything an expert might have said to further challenge the eyewitness testimony." (LD 23 at 7.) <u>See</u> <u>Wildman v. Johnson</u>, 261 F.3d 832, 839 (9th Cir. 2001) (petitioner's speculation about expert's testimony is insufficient to establish prejudice under <u>Strickland</u>) (citing <u>Grisby v. Blodgett</u>,130 F.3d 365, 373 (9th Cir. 1997)).

Petitioner does not meet his heavy burden here. He cannot and did not establish that trial counsel performed deficiently, as discussed above. <u>Strickland</u>, 466 U.S. at 690. Nor has he established prejudice even assuming deficiency. Speculation or conceivability that the result of the proceedings might have been different had an eyewitness expert testified is not sufficient to overcome the applicable burden. <u>Strickland</u>, at 691-94; <u>Richter</u>, 562 U.S. at 112. Petitioner did not demonstrate there was a reasonable probability that the outcome of the proceeding would have been different had such an expert testified.

The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254(d)(1). As a result, the undersigned recommends the claim asserted by petitioner in ground two of his petition be denied.

C. *Trial Counsel Provided Ineffective Assistance of Counsel – Pretrial Investigation*

Next, petitioner argues trial counsel cumulatively provided ineffective assistance of counsel by "utterly" failing to conduct a pretrial investigation, including locating alibi witnesses, securing the aforementioned eyewitness expert testimony, contesting or suppressing faulty identification evidence, conducting any discovery, and subpoenaing "the police department['s

18

mug photos of others with face tattoos," resulting in a violation of his Sixth Amendment rights. (ECF No. 1 at 4, 44-53.) In response, respondent argues this claim is both procedurally barred and lacking in merit. (ECF No. 24 at 18-22.)

The claim was denied by the San Joaquin County Superior Court following that court's consideration of petitioner's state habeas petition:

> Petitioner asserts his trial counsel was ineffective for failing to suppress a photo lineup, [and] for failing to subpoena other photos of persons with tattoos of 1 and 4 on their faces ….
>
> Petitioner fails to support any of his claims with competent, reasonably available evidence. *People v. Duvall* (1995) 9 Cal.4th 464, 474.
>
> It also appears that Petitioner knew the bases of his claims shortly after trial, but his Petition fails to explain why he delayed in bringing this Petition. *In re Robbins* (1998) 18 Cal.4th 770, 780.
>
> Accordingly, the Petition is DENIED. *In re Bower* (1985) 38 Cal.3d 865, 872; *People v. Jackson* (1980) 28 Cal.3d 264, 296.

(LD 28; <u>see also</u> ECF No. 24 at 39-40 [Ex. B at 1-2].)

*Applicable Legal Standards*

The general legal standards pertaining to a claim of ineffective assistance of counsel are provided above.

Additionally, defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691. In <u>Cullen v. Pinholster</u>, the Supreme Court reiterated that

> "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions ...." *Id.*, at 688–689, 104 S.Ct. 2052. *Strickland* itself rejected the notion that the same investigation will be required in every case. *Id.*, at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary" (emphasis added)). It is "[r]are" that constitutionally competent representation will require "any one technique or approach." *Richter*, 562 U.S., at 106, 131 S.Ct., at 779.

<u>Pinholster</u>, 563 U.S. at 195.

*////*

It is clearly established federal law that the failure of trial counsel to file a motion to suppress may support a claim of ineffective assistance of counsel. Premo v. Moore, 562 U.S. 115, 122 (2011); Kimmelman v. Morrison, 477 U.S. 365, 383 (1986). In order to prevail on the deficient performance prong of Strickland, a petitioner must demonstrate that his counsel's failure to file such a motion "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. In order to demonstrate prejudice, a petitioner must demonstrate that: (1) the motion is meritorious, and (2) the verdict would have been different absent the excludable evidence. Kimmelman, 477 U.S. at 375; Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999). See also Ceja v. Stewart, 97 F.3d 1246, 1253 (9th Cir. 1996) (trial counsel is not ineffective in failing to file a suppression motion "which would have been 'meritless on the facts and the law'").

*Analysis*

**Procedural Bar/Default**

As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Walker v. Martin, 562 U.S. 307, 314 (2011) (quoting Beard v. Kindler, 558 U.S. 53 (2009)). However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same"); Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of procedural default should ordinarily be considered first, a reviewing court need not do so invariably, especially when the issue turns on difficult questions of state law). Where deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claim on the merits and forgo an analysis of procedural default. See Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S. at 525).

Here, the state court denied petitioner's habeas petition with citation to <u>In re Robbins</u>, 18 Cal.4th 770, 780 (1998). (LD 28.) Citation to <u>Robbins</u> refers to California's timeliness requirement for state habeas petitions. As the state court clearly and expressly stated that its judgment rests on a state procedural bar, procedural default is appropriate if the timeliness rule is independent and adequate.

The Ninth Circuit has held that California's timeliness rule for state habeas petitions is not interwoven with federal law and therefore constitutes an independent procedural ground. <u>See</u> <u>Martin</u>, 562 U.S. at 312 (citing <u>Bennett v. Mueller</u>, 322 F.3d 573, 582-83 (9th Cir. 2003)). The Supreme Court has held that the timeliness rule is firmly established, regularly followed, and therefore constitutes an adequate procedural ground. <u>Martin</u>, 562 U.S. at 317-22. Accordingly, the undersigned finds that petitioner has procedurally defaulted this claim.

A petitioner "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." <u>Martinez v. Ryan</u>, 566 U.S. 1, 10 (2012). Attorney error on direct appeal constituting ineffective assistance of counsel provides "cause" to excuse procedural default. <u>Martinez</u>, 566 U.S. at 11; <u>Coleman v. Thompson</u>, 501 U.S. 722, 754 1991). Nevertheless, a claim of ineffective assistance generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." <u>Murray v. Carrier</u>, 477 U.S. 478, 489 (1986). Here, petitioner did not respond to respondent's assertion of the timeliness bar; he did not file a traverse or reply to respondent's answer. As a result, petitioner has not demonstrated cause. Nor has petitioner demonstrated an actual substantial disadvantage of constitutional dimension or factual innocence. Therefore, the undersigned largely agrees with respondent that the claim is procedurally defaulted and barred from federal habeas review. The claim should be rejected on that basis. In any event, petitioner's claim is also without merit.

**Merits**

Petitioner contends trial counsel failed to file a discovery motion or to subpoena or move for photographs or mugshots depicting other individuals with face tattoos with the number 14, asserting the failure constitutes deficient performance. Petitioner claims this evidence would

have "demonstrated the photographic evidence used was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification,'" citing to Simmons v. United States, 390 U.S. 377, 384 (1968). (ECF No. 1 at 5, 44-53.)

First, a review of the record reveals that trial counsel's strategy regarding the identification of petitioner as a perpetrator was to attack the credibility of the victims, as discussed more fully in the previous claim. That was a reasonable decision and made further investigation unnecessary. Pinholster, 563 U.S. at 195. Moreover, while trial counsel did not file a discovery motion specifically addressing the photographs selected from the I-Mug database, counsel did challenge the method employed by Detective Desimone in making those photographic selections and cross-examined the victim witnesses specifically regarding the identification of petitioner. These were reasonable tactical decisions made by trial counsel. Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Next, petitioner simply complains, in a subheading without any discussion, that trial counsel failed to hire an investigator to identify and interview potential witnesses. He makes no effort to explain what witnesses may have been identified and interviewed, or to what they would have testified. Mere speculation is insufficient to establish a claim of ineffective assistance of counsel. See Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (finding that mere speculation that witness might have given helpful information if interviewed insufficient to establish ineffective assistance of counsel); Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective-assistance-of-counsel claim based on counsel's failure to interview or call alibi witness because petitioner provided "no evidence that this witness would have provided helpful testimony for the defense"); see also Turner v. Calderon, 281 F.3d 851, 881 (9th Cir. 2002) ("self-serving statement" insufficient to raise claim for relief).

In sum, the record reveals counsel for petitioner investigated the matter and sought additional discovery, and that the investigation reasonably guided counsels' trial strategy. (See, e.g., LD 4 at 59-68; LD 17 at 28, 72-80, 123, 128-37, 140, 141-44, 151-79, 184-86, 193-206; LD 23 at 6-7.) Strickland, 466 U.S. at 691; Pinholster, 563 U.S. at 195.

With regard to petitioner's related argument that trial counsel was ineffective for failing to move to suppress identifications made employing the I-Mug shots, petitioner's claim is lacking. He cannot demonstrate trial counsel's failure to file such a motion "fell below an objective standard of reasonableness" for the same reasons articulated in ground two, *ante*. Strickland, 466 U.S. at 687-88. Further, petitioner did not demonstrate that such a motion would have been meritorious and that the verdict would have been different. Kimmelman, 477 U.S. at 375. An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel. Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)).

Petitioner did not establish prejudice in any event. He has not shown there was a reasonable probability of a different outcome but for trial counsel's alleged errors. Strickland, 466 U.S. at 693-94.

Lastly, as to petitioner's claim of a cumulative effect in light of the alleged errors, this too must fail. "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." Peyton v. Cullen, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973)). As discussed throughout these finding and recommendations, however, petitioner does not allege any claims that amount to error, and thus petitioner demonstrates no errors that can accumulate to a level of a constitutional violation. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002), overruled on other grounds by Slack v. McDaniel, 529 U.S. 973 (2000). "Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible." Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).

The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254(d)(1). As a result, the undersigned recommends the claim asserted by petitioner in ground three of his petition be denied.

////

////

23

1        D. *Brady Error in Violation of Petitioner's Due Process Rights*

2        Lastly, petitioner argues <u>Brady</u> error where the "prosecution led the jury to believe that no

3    one in [his] county had face tattoos like his," using testimony by investigators "heavily during

4    closing arguments [to contend petitioner] was guilty because of this impeachment/perjured

5    testimony." (ECF No. 1 at 4, 53-57.)  Respondent asserts this claim too is procedurally barred,

6    and that the state court's determination was reasonable.  (ECF No. 24 at 23-26.)

7        The claim was also denied in a reasoned decision by the San Joaquin County Superior

8    Court following that court's consideration of petitioner's state habeas petition:

9            Petitioner also asserts that the prosecution committed *Brady* error by
             not producing photos (mug shots) of other persons with 1 and 4
10           tattooed on their faces, and that it was improper for the court to direct
             the jury to further deliberate when it appeared hung. *Brady v.*
11           *Maryland 373 US 83 (1963).*

12           ………………………………………………………………………….

13           Petitioner fails to support any of his claims with competent,
             reasonably available evidence. *People v. Duvall (1995) 9 Cal.4th*
14           *464, 474.*

15           It also appears that Petitioner knew the bases of his claims shortly
             after trial, but his Petition fails to explain why he delayed in bringing
16           this Petition.  *In re Robbins (1998) 18 Cal.4th 770, 780.*

17           Accordingly, the Petition is DENIED. *In re Bower (1985) 38 Cal.3d*
             *865, 872; People v. Jackson (1980) 28 Cal.3d 264, 296.*
18

19   (LD 28; <u>see also</u> ECF No. 24 at 39-40 [Ex. B at 1-2].)

20                *Applicable Legal Standards*

21       The court may grant habeas relief on a prosecutorial misconduct claim only if the

22   misconduct rises to the level of a due process violation.  <u>Sechrest v. Ignacio</u>, 549 F.3d 789, 807

23   (9th Cir. 2008).  A violation of a defendant's rights occurs if the government knowingly uses

24   false evidence in obtaining a conviction.  <u>Giglio v. United States</u>, 405 U.S. 150, 153-54 (1972);

25   <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).  It is clearly established that "a conviction obtained

26   by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood

27   that the false testimony could have affected the jury's verdict.  <u>United States v. Bagley</u>, 473 U.S.

28   667, 680 n.9 (1985); <u>see also</u> <u>Morales v. Woodford</u>, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The

due process requirement voids a conviction where the false evidence is 'known to be such by representatives of the State'") (quoting <u>Napue</u>, 360 U.S. at 269).  Due process is violated in such circumstances regardless of whether the false testimony was obtained through the active conduct of the prosecutor, or was unsolicited.  <u>Napue</u>, 360 U.S. at 269 ("[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears"); <u>Hysler v Florida</u>, 315 U.S. 411 (1942); <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935).  This rule applies even where the false testimony goes only to the credibility of the witness.  <u>Napue</u>, 360 U.S. at 269; <u>Hayes v. Brown</u>, 399 F.3d 972, 986 (9th Cir. 2005).

To establish a claim where a prosecutor has purportedly introduced perjured testimony, the petitioner must first establish that the testimony was false.  <u>United States v. Polizzi</u>, 801 F.2d 1543, 1549-50 (9th Cir. 1986).  Next, the petitioner must demonstrate that the prosecution knowingly used the perjured testimony.  <u>Id.</u>  And lastly, the petitioner must show that the false testimony was material.  <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003).  False evidence is material "if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury."  <u>Hein v. Sullivan</u>, 601 F.3d 897, 908 (9th Cir. 2010) (quoting <u>Bagley</u>, 473 U.S. at 678).  Mere speculation regarding these factors is insufficient to meet the required burden on the petitioner.  <u>United States v. Aichele</u>, 941 F.2d 761, 766 (9th Cir. 1991).

In <u>Brady v. Maryland</u>, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  The duty to disclose such evidence is applicable even though there has been no request by the accused.  <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976).  The duty encompasses impeachment evidence in addition to exculpatory evidence.  <u>Bagley</u>, 473 U.S. at 676.  A <u>Brady</u> violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor."  <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 870 (2006) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) ["the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"]).

As stated in <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999), three components are required to establish a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>See also</u> <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005). "The prosecutor, although 'not required to deliver his entire file to defense counsel,' is required to turn over evidence that is both favorable to the defendant and material to the case." <u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting <u>Bagley</u>, 473 U.S. at 675).

A defendant is prejudiced by a <u>Brady</u> violation if the evidence that was not produced is material. <u>Amado v. Gonzalez</u>, 758 F.3d at 1134. Evidence is material if "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." <u>Strickler</u>, 527 U.S. at 289. "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Id.</u> (quoting <u>Kyles</u>, 514 U.S. at 434); <u>see also</u> <u>Silva</u>, 416 F.3d at 986. Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. <u>Kyles</u>, 514 U.S. at 435-36; <u>Silva</u>, 416 F.3d at 986. "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." <u>Silva</u>, 416 F.3d at 986.

*Analysis*

**Procedural Bar/Default**

Respondent asserts this claim is procedurally barred due to the San Joaquin Superior Court's citation to <u>In re Robbins</u> in its denial of the claim. (ECF No. 24 at 23-24.)

As previously noted, the Supreme Court has held that California's timeliness rule for state habeas petitions is firmly established, regularly followed, and constitutes an adequate procedural ground. <u>Martin</u>, 562 U.S. at 312, 317-322. The undersigned agrees with respondent that the state superior court's citation to <u>Robbins</u> is a bar to this court's consideration of petitioner's claim. Even so, petitioner's claim fails on its merits.

26

**Relevant Background**

Detective Anthony Desimone of the Stockton Police Department testified on direct examination that after obtaining a description from Yesenia of the "suspect who got away" - "a Mexican male with very short hair, almost shaved, and that he had tattoos on his face" - and specifically "a '14,'" he entered those particulars, as well as age, height and weight estimates, into the "I-Mug database." (LD 9 at 672.) Desimone testified he entered "tattoos for [the] face" and "didn't put in any numbers of any description of the tattoos." (LD 9 at 672-73.) About sixty photos were generated and reviewed by Yesenia. (LD 9 at 673.) Upon seeing petitioner's photograph, Yesenia stated "'That looks like him, I think that's him.'" (LD 9 at 673-74.) Desimone testified that on the admonition form Yesenia signed, his own notes include that Yesenia said "'That looks like the guy with the gun, it was a silver handgun, while we were in the car - - while in car pulled red bandanna off face, saw '1' and '4' on his cheeks, I think it's him, it looks like him.'" (LD 9 at 676.)

On cross-examination by petitioner's attorney, Detective Desimone confirmed he asked the I-Mug database to provide photos of individuals with "facial tattoos" rather than specifying tattoos with a "'14' or '1,' '4.'" (LD 9 at 703.) He agreed that no other individuals depicted in the photos shown to Yesenia had the numerals '1' and/or '4' on their face, although a number of them had a 'XIV' tattoo. (LD 9 at 703-04.) The detective confirmed that Marco Serrano was shown the same photo grouping as that shown to Yesenia, but he did not identify anyone. (LD 9 at 714.)

On redirect, the detective was asked, and responded to, the following relevant questions:

> Q.  And are there any other photographs you're aware of, through this I-Mug process, of any other persons in San Joaquin County that has a large "1" and "4" on separate cheeks?
>
> A.  As I sit here today, yes, I know of one other now.
>
> Q.  Okay. And where was he on the date of the incident?
>
> A.  I don't believe he actually had those on the day of the incident, I think they've been since then.
>
> Q.  But you know of somebody since?

A. (Nods head up and down.)

Q. Okay. And how do you know that?

A. Um, I was doing another lineup and I came across that photo.

Q. And did you go back and make sure that 'nother guy with a "1" and a "4" - - I mean, you want to - - what you'd do to ensure that the person that you saw on some suspect [b]ooking photo wasn't in the car on December 11th, 2008?

A. I looked at his previous booking photos.

Q. And what'd you find?

A. That he didn't have those, the "1" and the "4."

Q. And were those after the - - his booking photos for this other person, after December 11th, 2008?

A. Yes.

(LD 9 at 722-23.) Subsequently, on re-cross, Detective Desimone testified that he believes he did a search of the I-Mug system with "just a '14' [on the face] to see how many names popped up," but "it came up no result." (LD 9 at 723-24.)

Stockton Police Officer Mike Rodriguez testified during cross examination by petitioner's attorney that he had not had contact with Norteño members in Stockton or San Joaquin County that had a "1" and a "4" on their face, but he had come across "guys that have 'X' and a '4.'" (LD 9 at 838.) Asked about his testimony at the preliminary hearing where he previously testified that "[f]rom what [he] remember[ed]," there were other gang members with "'1' and a '4' on their face," Rodriguez indicated those numerals were not as large as petitioner's and that his recollection at the time included individuals with roman numeral tattoos. (LD 9 at 839-40.) Thereafter, Rodriguez was specifically asked by defense counsel about Hector Torres, Joe Milan and Ramon Godines. Rodriguez testified he was not aware that Torres "had a '1' and a '4' under his eyes," and did not recall Milan having such tattoos. When asked whether Godines had "a '1' and a '4' on the left side of his face," Rodriguez indicated he was aware Godines had "tattoos on his face," but that did not remember the location of the tattoos. (LD 9 at 841-42.)

On redirect examination, Rodriguez replied "No, I'm not," in response to the prosecutor's question of whether he knew of any gang members in San Joaquin County "with a '1' and a '4'

28

the size of Vincent Torres' on two separate cheeks." (LD 9 at 866-67.)

Detective Desimone also testified in the People's rebuttal case. The detective was asked whether, after hearing Officer Rodriguez's testimony regarding three individuals who also had facial tattoos with the numerals "1" and "4," he had checked to determine whether any of the three had tattoos similar to petitioner. Desimone indicated that one of three individuals – Ramon Godines – did, and that Sergio Morales was shown Godines' photo. (LD 10 at 1008-09.) Neither of the other two individuals however had a "1" or a "4" tattooed on their face similar to petitioner. (LD 10 at 1009.)

Following the guilty verdicts, trial counsel filed a motion for new trial asserting newly discovered evidence and that the verdicts were against the weight of the evidence. (LD 5 at 323-26.) The People opposed the motion. (LD 5 at 327-34.) At oral argument on the motion, counsel for petitioner argued that newly discovered evidence revealed there were other individuals in San Joaquin County with the numerals "1" and "4" tattooed on their faces, and that had that evidence been known at the time of trial, counsel could have further impeached Desimone's testimony concerning the photo lineup shown to Yesenia selected from the I-Mug database, and containing only petitioner's mugshot. (LD 16 at 1268-76.) In denying the motion for new trial, the trial court held, in relevant part, "that the proffered new evidence does not in fact constitute new evidence under the circumstances which were described in the motion and by counsel here today and during the course of the trial, and therefore, the motion is denied on the ground that you -- there is in fact new evidence in this matter." (LD 16 at 1276.)

Significantly, the People's opposition to petitioner's motion states that the individual identified by petitioner as one that should have been included in the photo lineup because he had similar facial tattoos is "Marcel Cepeda." Cepeda "was incarcerated in Salinas Valley State Prison from December 24, 2007, to April 12, 2009," and because Cepeda could not have committed the crime here, the evidence would have done little to undermine the credibility of the detective's trial testimony or "wholly undermine the prosecution's case, [or] unerringly point to Defendant's innocence." (LD 5 at 330.)

////

1 **Discussion**

2      As to any clam of false or perjured testimony, petitioner's claim fails. Based on this

3 record, the state court could have concluded that petitioner did not establish the testimony of

4 Desimone or Rodriguez was false. <u>United States v. Polizzi</u>, 801 F.2d at 1549-50. Further, this

5 record does not establish that the prosecution knowingly used perjured testimony. <u>Id.</u> at 1549-50.

6 And, even if the state court were to have assumed the testimony was false, it could have

7 concluded on this record that petitioner did not show the evidence was material because there was

8 no reasonable likelihood that evidence could have affected the jury's verdicts. <u>Hein v. Sullivan</u>,

9 601 F.3d at 908. The jury heard the testimony of Desimone and Rodriguez, including testimony

10 elicited on cross examination by petitioner's attorney, casting doubt on the issue of whether other

11 individuals with facial tattoos in San Joaquin County should have been included in the I-Mug

12 database. But the jury heard other weighty evidence affecting its finding that petitioner was the

13 second suspect who got away on the night of the incident. Significantly, and what petitioner fails

14 to acknowledge here, is the evidence, including videotaped evidence played for the jury, of his

15 attempt to escape police custody following his arrest by breaking a second story window and

16 attempting to jump from it, and the letters petitioner wrote while in custody awaiting trial wherein

17 he referred to Yesenia as a rat or snitch, and Sergio Morales' in court identification of petitioner

18 as the suspect with the gun.[5]

19      Applying the three components required to establish a <u>Brady</u> violation, the state court

20 could have properly concluded no violation occurred. First, petitioner did not establish the

21 evidence he claims was not disclosed was exculpatory. The record reveals that Cepeda was

22 incarcerated at the time of the incident giving rise to these charges. And, there was no showing

23 that the booking photo was a part of the I-Mug database when Detective Desimone accessed it in

24 2009. As to any impeachment value, because there was no showing Cepeda's booking photo was

25 a part of the database, any impeachment on this basis would be of very limited value. Second, for

26

27     [5] In court, Morales identified petitioner as the individual armed with the gun. (<u>See</u> LD 7 at 285.)
On redirect, Morales testified he was "one hundred percent" certain regarding his identifications
28 of petitioner and Raymond as the suspects. (LD 8 at 371.)

the same reasons, petitioner did not establish that the state willfully or inadvertently suppressed this or even other evidence like it.  Finally, with regard to prejudice, for the reasons noted in the prior paragraph, petitioner did not establish that in the absence of this evidence, he did not receive a fair trial.  Strickler v. Greene, 537 U.S. at 281-82, 289-90; United States v. Agurs, 427 U.S. at 109-10 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense").

In sum, the state court's denial of petitioner's claim was not unreasonable.  28 U.S.C. § 2254(d).  Fairminded jurists could disagree on the correctness of the state court's decision. Richter, 562 U.S. at 101.  Hence, petitioner is not entitled to relief and the undersigned recommends that the claim asserted in ground four of the petition be denied.

VI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  September 4, 2019
torr0812.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE